**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **Joseph Baron, Jr.,** | ) | **CASE NO.  1:04CV2438** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE KATHLEEN M. O'MALLEY** |
| | ) | |
| **v.** | ) | |
| | ) | **ORDER** |
| **Watson Pharmaceuticals, Inc.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

On October 29, 2004, Joseph Baron, Jr., plaintiff, filed the above-captioned case in the Court of Common Pleas for Cuyahoga County, Ohio, against Watson Pharmaceuticals, Inc. ("Watson") alleging numerous state law claims.  On December 10, 2004, Watson filed a Notice of Removal to this Court.  Jurisdiction is based on diversity of citizenship.  Baron is a citizen of Ohio and Watson is a Nevada corporation headquartered in California.  The amount in controversy is alleged to exceed $75,000.

On July 25, 2006, Watson filed a motion for summary judgment and it has been fully briefed. For the following reasons, Watson's Motion for Summary Judgment (Doc. No. 26) is hereby **GRANTED**.

## I.    BACKGROUND

In 1997, Baron began working as a Sales Representative at Watson.  (Baron Dep. 53.)  In 2002, he was promoted to Sales Representative 2 in the Urology Division, reporting to Matt Snyder, Regional Sales Manager. (Id. 53; Manfredi Dep. 14.)  Snyder reported to John Manfredi, Executive Sales Director.  (Baron Dep. 53; Manfredi Dep. 10.)  Baron alleges that, throughout his time at Watson, he received promotions and awards and consistently met his goals.  (Baron Dep. 74, 75, 125, 127, 149.)

In 2003, Watson launched a new drug, Oxytrol, which was the primary focus for all sales representatives. (Id. 89.)  After Oxytrol was launched, Watson required its sales representatives to increase Watson's market share in their respective territories - increasing from a previous two to three percent market share requirement to an eight to ten percent market share requirement.  (Id. 90.)  The sales representatives were to target this new ultimate goal, and were expected to reach progressively higher levels on their way to this goal by specified target dates.

On August 27, 2003, after the market share in Baron's territory reached only 0.5 percent, Watson placed him on a Performance Improvement Plan ("PIP.")[1]  (Id. 124, 130-31, 136; Ex. 7.)  He was told to increase his market share to at least two percent or be subject to further discipline.  (Id. 130, 138; Exh. 7 and 9.)  On October 6, 2003, Baron received a final warning letter, continuing his PIP, because he still had not increased his market share to the required two percent.  (Id. 141, 142; Ex. 10.)

_____

[1]Baron admitted this was not his first PIP.  He had received two prior PIPs – one in 1999 and another in 2001.  The 1999 PIP was based on his 1998 sales.  At that time, his year end evaluation was under a 3.0 rating for overall performance.  The 2001 PIP was because his overall performance in 1999 and 2000 was in the bottom 20% of the bonus payout pool.  (Exh. 5, 6.)

On December 8, 2003, in a meeting with John Manfredi and Matt Snyder, Baron was given a second "final warning" letter. (Id. 194-95; Ex. 16.) Though Baron had increased his market share to 2.2 percent, by this time, sales representatives were expected to have achieved at least a three percent market share. (Id. 196-198; Ex. 16.) Also, Baron's ranking was 84th out of 90 sales representatives based on his Oxytrol sales.[2] (Id. 198, 201.) Because he had shown improvement, however, Watson allowed him to continue working as a Sales Representative and to continue to strive to meet the company's goals, subject to this additional warning.

On December 15, 2003, Baron suffered a heart attack. (Id. 35-35.) He took an approved medical leave of absence, and received short-term disability benefits. (Id. 155-56.) Snyder informed Baron's co-workers that he had a heart attack, and told them where they could visit him or send him well-wishes. (Id. 68-70.) Two Watson sales representatives visited him at the hospital. (Id. 68-69.) Baron testified he did not have an issue with his supervisor informing his co-workers of his health condition. (Id. 70.)

Following Baron's heart attack and rehabilitation, he stated he had - and continued to have - no limitations; he was able to do all his normal daily activities. (Id. 238.) He further admitted his condition had been temporary.[3] (Id.) On February 16, 2004, after being cleared by his physician, Baron returned to work. (Id. 59, 172; Ex. 13.)

On Friday, February 20, 2004 (the Friday of his first week back to work), Watson informed Baron that it was undergoing a reorganization and that Baron's position would be eliminated and his

---

[2]In October, 2003, he had been ranked 76 out of 90. (Baron Dep. Exh. 10.)

[3]Baron testified that there was permanent damage to his heart caused by the heart attack that cannot be repaired. But he admitted that, as far as his daily activities are concerned, he is back to normal. (Baron Dep. 239.)

sales territory realigned.  (Id. 156, 165-66, 210.)  Baron testified he could not specifically recall, but he may have been told by Watson that the elimination of his position and the reorganization of his territory "might have been based on his performance and geography."  (Id. 156, 165, 166, 210).

On February 23, 2004, Baron submitted a doctor's note to Watson stating he needed to go on leave again until March 31, 2004.  (Id. 160-61 and Ex. 12.)  Subsequently, he received a written notice of termination from Watson that was effective February 27, 2004.

Baron was forty-nine at the time of his termination.  (Baron Dep. 5.)  He alleges Watson retained employees who were younger and who were not disabled.

Baron filed his complaint charging seven violations: 1) Breach of Implied Contract; 2) Intentional Infliction of Emotional Distress; 3) Promissory Estoppel; 4) Violation of Public Policy, 5) Age Discrimination in violation of Ohio Rev. Code § 4112.02(N); 6) Handicap Discrimination in violation of Ohio Rev. Code § 4112.99; and 7) Invasion of Privacy.

## II.    STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The party moving for summary judgment bears the initial burden of production under Rule 56.  The burden may be satisfied by presenting affirmative evidence that negates an element of the non-movant's claim or by demonstrating "an absence of evidence to support the non-moving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

If the movant meets this burden, the non-movant must "set forth the specific facts showing

that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  The substantive law identifies which specific facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  To avoid summary judgment, the non-movant must "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 256 (citing Adickes v. Kress & Co., 398 U.S. 144, 158-59 (1970)).  However, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "[T]he mere existence of some alleged factual disputes between the parties will not defeat an otherwise properly supported motion" for summary judgment. Anderson, 477 U.S. at 247-48.

## III.     LAW AND ANALYSIS

### A.      Age Discrimination Claim

Baron alleges an age discrimination claim under Ohio Rev. Code § 4112.02(N).  Watson argues that this claim is time-barred since the claim was filed eight months after his termination. Baron does not dispute this argument.  The statute applies a 180-day statute of limitations to such claims:

> An aggrieved individual may enforce the individual's rights relative to discrimination on the basis of age as provided for in this section by instituting a civil action, within one hundred eighty days after the alleged unlawful discriminatory practice occurred, in any court with jurisdiction for any legal or equitable relief that will effectuate the individual's rights.
>
> A person who files a civil action under this division is barred, with respect to the

> practices complained of, from instituting a civil action under section 4112.14 of the
> Revised Code and from filing a charge with the commission under section 4112.05
> of the Revised Code.

Ohio Rev. Code § 4112.02(N) (2006).

On February 27, 2004, Baron was terminated.   He filed his complaint on October 27, 2004,

which is well beyond the 180-day limitation prescribed by Ohio law.[4]  Baron's age discrimination

claim, therefore, is time-barred.  Watson's motion for summary judgment must be granted as to this

claim.

---

[4]Even if the age discrimination claim was not time-barred, Watson argues that Baron fails
to establish such a claim because there is no dispute that his position was eliminated as part of a
reduction in force ("RIF").  In order to overcome this argument, Baron must present "additional
direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the
plaintiff for discharge for impermissible reasons."  Williams v. Emco Maier Corp., 212
F.Supp.2d 780, 784 (S.D. Ohio 2002); Barnes v. GenCorp, Inc., 896 F.2d 1457, 1465 (6th Cir.
1990).

Watson argues Baron's position was eliminated because of his low Oxytrol sales, as
compared to other sales representatives, and because he was on a final warning at the time of the
RIF.  Baron contends Watson cannot offer a legitimate reason for his termination, but gives no
explanation; he simply asserts that he "felt" he should have been retained.

Baron's conclusory allegation that he "felt" there was no reason for him to be laid off
other than his age and/or disability is insufficient evidence of age discrimination.  See, e.g.,
Mitchell v. Toledo Hosp., 964 F.2d 577, 585-86 (6th Cir. 1992), ("conclusory allegations and
subjective beliefs . . . are wholly insufficient evidence to establish a claim of discrimination as a
matter of law."); Chappell v. GTE Products Corp., 803 F.2d 261, 268 (6th Cir. 1986) (Mere
personal beliefs, conjecture and speculation are insufficient to support an inference of
discrimination.)

Baron presents no evidence of age discrimination.  It is not enough that he personally
believed he was terminated because of his age.  Even if his claim was not time-barred, it is likely,
therefore, that the Court would grant Watson's motion for summary judgment on his age
discrimination claim.

-6-

**B.**     **Disability Claim**

Baron also claims he was discriminated against based on his alleged disability pursuant to Ohio Rev. Code § 4112.99.  Watson argues Baron is unable to establish such a claim.

To establish a disability discrimination claim a plaintiff must prove:

(1)     That he was disabled;

(2)     That his employer took an adverse employment action against him at least in part because he was disabled; and,

(3)     That he could safely and substantially perform the essential functions of the job in question despite his disability.

Hood v. Diamond Products, Inc., 74 Ohio St.3d 298 (1996).

Pursuant to Ohio Rev. Code § 4112.01(A)(13), disability "means a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of physical or mental impairment; or being regarded as having a physical or mental impairment."  Ohio Rev. Code **§** 4112.01(A)(13).

Baron contends he has established a prima facie case of disability discrimination.  He argues first that he has a disability; he suffered a heart attack on December 15, 2004.  (Baron Dep. 35-36.)  Next, he states he was qualified for the position because he had been a Sales Representative for approximately 7 years.  He then argues he was discharged and replaced by other employees who do not have physical restrictions.  Finally, he contends Watson employees told Baron's contacts in his sales territory that he had a heart attack and would not be returning to work - indicating that Watson considered Baron disabled.

Baron, however, has not set forth specific facts to show he was disabled.  He does not explain

-7-

how his heart attack impacted any major life activity. Furthermore, he does not cite to any cases holding that suffering a heart attack is a disability under state or federal law (nor could the Court locate such a case.) The fact that Baron suffered a heart attack, without more, is insufficient to render him disabled as a matter of law. See Curry v. Empire Berol, U.S.A., No. 97-5012, 1998 LEXIS 461 at *6 (6th Cir. Jan. 7, 1998) (finding that a plaintiff who suffered heart attack and returned to work without restrictions was not disabled).

Baron also presented no evidence that Watson regarded him as disabled. There is no fact in the record indicating that Baron's managers regarded him as having a physical impairment other than the allegation that physicians' offices in his sales territory were told by Watson management that Baron had suffered a heart attack and would not be returning. Baron presented no evidence that anyone in Watson's management actually contacted the physicians' offices in his former territories regarding his heart attack, however. (Id. 70-71). Instead, Baron's best guess was that the comments made to his clients were the result of " youth and ignorance" on behalf of his co-workers, and he concedes the comments were "nothing spiteful." (Id.)

For the foregoing reasons, the Court holds that Baron is not disabled, nor regarded as disabled, within the meaning of Ohio's disability discrimination statute. Thus, he has failed to establish even the first element of a valid disability claim. Accordingly, Watson's motion for summary judgment is granted on this claim.

### C. Implied Contract, Promissory Estoppel, and Public Policy Claims

Under Ohio law, an employment relationship, absent an agreement to the contrary, is regarded as employment at-will. The employment at-will doctrine provides that the employer may terminate the employment relationship at any time for any reason so long as the reason is not contrary to law.

-8-

Mers v. Dispatch Printing Co., 19 Ohio St.3d 100, 104 (Ohio 1985).

Ohio courts have recognized some exceptions to this doctrine.  First, under the implied contract exception, employee handbooks, company policy, and oral representations may give rise to implied contractual provisions that alter the terms of an oral at-will employment relationship.  Mers, supra, at 104.  Second, an employer's right to discharge an employee may also be limited by representations or promises made to the employee which fall within the doctrine of promissory estoppel.  Id.  Promissory estoppel may apply to at-will employment relationships if the employer should have reasonably expected the employee to rely on its representations or promises, and the employee actually relies on the promises and representations to his detriment.  Mers, supra, paragraph two of the syllabus.  Third, there is a public policy exception to the employment at-will doctrine.  See Painter v. Graley, 70 Ohio St.3d 377 (Ohio 1994).  To sustain a public policy claim, the employee must show, among other things, the existence of a clear public policy which would be violated or jeopardized by an employer's discharge of the plaintiff under the circumstances.  See Kulch v. Structural Fibers, Inc., 78 Ohio St.3d 134, 151 (Ohio 1997).

### 1)    Implied Contract

Baron alleges Watson breached an implied contract when he was terminated without just case. He argues that he relied on representations reflected by promotions and awards and believed that, because of his good work performance, he would not be terminated except for just cause.

Watson argues Baron was an at-will employee, and that he could be terminated at any time. When Baron first applied at Watson in 1997, he read the employment application and initialed that he understood the following paragraph:

I understand that nothing contained in this application or conveyed during any

interview which may be granted is intended to create an employment contract.  I further agree that, if I'm hired, my employment is for no definite period.  I may be terminated at any time without prior notice at the option of either myself or the company.  I further understand that only the chief executive of the company has the authority to make any assurance to the contrary.

(Baron Dep. 49, 51; Ex. 1.)

After Baron started working at Watson, he received a copy of the employee handbook and executed an acknowledgment of receipt, which contained similar language confirming his at-will employment.  (Baron Dep. 54-55.)  On two separate occasions, Baron executed subsequent acknowledgments that he read and understood the company handbook.  (Id.)  Furthermore, Baron, at his deposition, testified candidly as follows:

Q.   And you understood that you were an employee at will, correct?
A.   Right.
Q.   And you didn't have any employment contract with Watson, right?
A.   Right.
Q.   And you could quit at any time and could be fired at any time as long as it was for legal reasons?
A.   Right.
Q.   And that was true during the entire period of your employment with Watson?
A.   Yes.

(Baron Dep. 52.)

Watson argues that the express language in the employment application, handbook, and acknowledgments, precludes an employment relationship other than at-will.  Baron rebuts by claiming there was a "meeting of the minds" between himself and Watson that Baron could only be terminated for just cause based on the fact that he had a history of good work performance and met his sales goals.  Watson counters with the fact that Baron did not testify he relied on his promotions, awards, or good reviews as a basis to believe he had an employment contract.  Rather, Baron testified he assumed he would be treated fairly by the company.  (Baron 105.)  He admitted he understood he

-10-

was an at-will employee.  (Id. 52, 57.)  He also admitted no one at Watson promised him anything or led him to believe that he would be employed long-term.  (Id. 225, 239.)

The Court agrees with Watson that it is clear Baron understood he was an at-will employee who could be terminated at any time for any reason.  Unfairness on the part of an employer, without more, is not actionable.  Baron simply has not proven that an implied contract existed.  Therefore, the Court hereby grants summary judgment to Watson on Baron's implied contract claim.

### 2)      Promissory Estoppel

Next, Baron argues he detrimentally relied on promotions, good reviews, and receipt of awards to conclude that the at-will relationship had been altered.  Watson contends Baron is unable to establish the elements of promissory estoppel.

The Ohio Supreme Court has held that a plaintiff must produce the following evidence in order to sustain a claim for promissory estoppel: 1) the employer made a promise; 2) the employer should reasonably have expected the promise to induce action or forbearance by the employee; 3) there was, in fact, such action or forbearance (detrimental reliance); and, 4) injustice can be avoided only by enforcement of the promise.  Mers v. Dispatch Printing Co., 19 Ohio St.3d 100, 104-05 (1985).

Routine congratulatory or vague employer statements and actions do not give rise to a promissory estoppel claim.  See, e.g., Condon v. Body, Vickers, and Daniels, 99 Ohio App.3d 12 (1994), Snyder v. AG Trucking, Inc., 57 F.3d 484, 489 (6th Cir. 1995).  In Wing, the Ohio Supreme Court described the nature of a promise that can give rise to a promissory estoppel exception to the employment at-will doctrine:

Standing alone, praise with respect to job performance and discussion of future career

-11-

development, will not modify the employment-at-will relationship. A demonstration of detrimental reliance on specific promises of job security can create an exception to the employment-at-will doctrine.

Wing v. Anchor Media Ltd., 59 Ohio St.3d 108, 110-11 (1991) citing Mers v. Dispatch Printing Co., 19 Ohio St.3d 100 (1985).

Baron has not offered any evidence of clear and unambiguous promises of job security. For this reason, the Court finds that the employment application, handbook and acknowledgments signed by Baron relieves Watson of any alleged oral promises; therefore, Watson is entitled to summary judgment in its favor on Baron's claim of promissory estoppel.

### 3) Violation of Public Policy

Baron lastly alleges Watson violated Ohio public policy - as expressed in the Ohio anti-discrimination laws - by terminating him due to age and/or disability discrimination. He bases his public policy claim on a violation of Ohio Revised Code § 4112.02, which provides in relevant part:

It shall be an unlawful discriminatory practice:

(A)  any employer, because of . . . disability, age . . . of any person, to discharge without just cause, . . . or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

Ohio Rev. Code § 4112.02(A).

In Greeley v. Miami Valley Maintenance Contractors, Inc., 49 Ohio St.3d 228 (1990), the Supreme Court of Ohio recognized a cause of action in tort for wrongful discharge in violation of public policy. It stated that "public policy warrants an exception to the employment-at-will doctrine when an employee is discharged or disciplined for a reason which is prohibited by statute." Id. at 234. To state a claim for wrongful discharge in violation of public policy, a plaintiff must establish

-12-

four elements:

1)     A clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the "clarity" element);

2)     The dismissal of the employee jeopardized the clearly established public policy (the "jeopardy" element);

3)     The employer's adverse action was motivated by the plaintiff's conduct related to the public policy concern (the "causation" element); and,

4)     The employer lacked an overriding legitimate business justification for the dismissal (the "overriding justification" element).

Collins v. Rizkana, 73 Ohio St.3d 65 (1995).  All four elements must be present, and the court must determine, as a matter of law, whether the first two elements are satisfied.  Kulch v. Structural Fibers, Inc., 78 Ohio St.3d 134, 151 (1997).  If either of the first two elements is lacking, the court must dismiss the claim as a matter of law.

Baron simply argues that, because his termination was based on discriminatory reasons, his termination violates public policy.  However, although an employer is prohibited from terminating, refusing to hire, or otherwise discriminating against an employee under Ohio law, as discussed above, Baron has not set forth a prima facie case against Watson for either age or disability discrimination. Public policy, therefore, does not warrant an exception to the at-will doctrine because Baron has not shown that he was terminated for a reason prohibited by such policy.  See Kulch, 78 Ohio St.3d at 150-51; see also Ekstrom v. Cuyahoga County Community College, 150 Ohio App.3d 169, 183 (2002)(since plaintiff failed to establish her discrimination claims, she has not proved that her discharge jeopardized the public policy of the discrimination statute.)  In accordance with Ekstrom, Baron has not met the jeopardy element of the Kulch test since he has not established discrimination

-13-

by Watson.  For these reasons, the Court grants Watson's motion for summary judgment as to Baron's violation of public policy claim.

### D.     Intentional Infliction of Emotional Distress Claim

Baron's emotional distress claim is based upon the distress he claims he experienced as a result of his termination.  He contends his termination, "without any explanation, without good cause and for a discriminatory reason," caused him to experience - and to continue to experience - shame, humiliation, public embarrassment, and loss of self-esteem.  He further claims his termination ten days after his return to work after suffering a heart attack is extreme and outrageous conduct.  Watson argues this claim is defective as a matter of law.

To establish a claim for intentional infliction of emotional distress, a plaintiff must prove the following four elements:

1.  That the actor either intended to cause emotional distress, or knew or should have known that the actions taken would result in serious emotional distress to the plaintiff;

2.  That the actor's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency," and was such that it can be considered "utterly intolerable in a civilized community;"

3.  That the actor's actions were the proximate cause of plaintiff's psychic injury; and,

4.  That the mental anguish suffered by the plaintiff is serious and of a nature that "no reasonable man could be expected to endure it."

Hanly v. Riverside Methodist Hosp., 78 Ohio App. 3d 73 (1991); Pyle v. Pyle, 11 Ohio App.3d 31 (1983).  Watson argues Baron cannot demonstrate "extreme and outrageous" conduct, nor that he suffered a "severe and debilitating" emotional injury from his termination.

With respect to "extreme and outrageous" conduct, the Ohio Supreme Court adopted the

-14-

following:

> It has not been enough that the defendant acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. **Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.** Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Yeager v. Local Union 20, 6 Ohio St.3d 369, 374-75 (1983).

The Court does not find Watson's conduct, even viewed in a light most favorable to Baron, to be extreme and outrageous as a matter of law. Criticism of an employee's job performance and termination – even if unfair – is insufficient to show the level of extreme and outrageous conduct needed to support an emotional distress claim under Ohio law. See Shinholster v. Akron Auto Ass'n., 711 F.Supp. 357 (N.D. Ohio 1989). As to "severe and debilitating" emotional injury, Ohio courts have stated: "an action to recover for emotional distress may not be premised upon mere embarrassment or hurt feelings, but must be predicated upon a psychic injury that is both severe and debilitating." Uebelacker v. Cincom Systems, Inc., 48 Ohio App.3d 268, 276 (Ohio App. 1988).

Watson argues Baron has presented no evidence that he suffered any severe and debilitating distress. Rather, Baron admitted he was able to cope with his displacement. Baron testified he was: ". . . able to workout, run, lift weights, . . . golf, . . . cleaning around the house, . . . do[ing] repairs. . . . [running and working out now] . . . three or four times a week." (Baron Dep. 43-44.)

In that Baron has not presented any evidence to show that Watson's conduct was "extreme and outrageous," or that Watson's conduct caused him "severe and debilitating" emotional injury,

Watson is entitled to summary judgment on Baron's claim of intentional infliction of emotional distress.

      **E.**      **Invasion of Privacy Claim.**

      Baron explains that his invasion of privacy claim is based on two separate comments Watson employees allegedly made to Watson customers.  Specifically, Baron asserts that two coworkers told customers that Baron had suffered a heart attack and would not be returning to work.

      Ohio courts recognize five elements that must be proven to establish a claim for invasion of privacy by publication of private facts: 1) the disclosure was public in nature; 2) the facts disclosed concerned an individual's private life, not his public life; 3) the matter publicized would be highly offensive and objectionable to a reasonable person of ordinary sensibilities; 4) the publication was made intentionally, not negligently; and, 5) the matter publicized was not of legitimate concern to the public.  Early v. The Toledo Blade, 130 Ohio App.3d 302, 342 (1998).

      Watson argues Baron cannot demonstrate the elements of this claim.  It argues Baron has no direct knowledge of such alleged comments.  (Baron Dep. 62-63, 67-68.)  Furthermore, Watson argues Baron presented no evidence to suggest that anyone in Watson's **management** contacted any of Baron's customers and told them that he had a heart attack.  Watson contends Baron only speculates that the rumor started out of ignorance and the youth of other sales representatives; in fact, Baron testified he believes nothing spiteful was behind the statements.  (Baron Dep. 70-71.)  Baron speculates that one of the regional managers in Women's Healthcare may have told its sales representatives about his heart attack and that those employees passed the news on to Baron's customers.  Baron admits, however, that he has no evidence to support that contention. (Id.) Furthermore, Baron admits the fact of his heart attack was common knowledge among his co-workers

who visited him at the hospital and that he did not ask that it be kept confidential.  (Baron Dep. 68-69.)

Baron presents no argument or case citations to the Court; he simply states that summary judgment should be denied to Watson because its employees informed Baron's contacts in his sales territory that he had a heart attack and would not be returning to work.  (Opposition Brief, page 11.)

The Court agrees with Watson; Baron has not presented facts sufficient to establish an invasion of privacy claim.  Baron does not demonstrate that the matter publicized would be highly offensive and objectionable to a reasonable person of ordinary sensibilities, or that the publication was made intentionally rather than negligently.  Contadino v. Tilow, 68 Ohio App.3d 463 (1990); McCormick v. Haley, 37 Ohio App.2d 73, 78 (1973) ("mere negligent intrusion into one's private activities does not constitute an actionable invasion of the right of privacy.")

For the above reasons, Watson's motion for summary judgment on Baron's invasion of privacy claim is hereby granted.

-17-

### III.    CONCLUSION

The Court concludes that, after construing the facts most favorably for Baron, no genuine issues of material fact exist and Watson is entitled to judgment as a matter of law on all of Baron's claims.  Therefore,

IT IS ORDERED THAT the Motion for Summary Judgment filed by Watson (Doc. No. 26) is **GRANTED** and this case is hereby **DISMISSED** in its entirety.


**IT IS SO ORDERED.**


<u>**s/Kathleen M. O'Malley**</u>
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**


**Dated: January 25, 2007**

-18-